## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **DAVIDSON CALFEE and ROBERT GATTI on behalf of themselves and all others similarly situated,**<br><br>**Plaintiffs,**<br>**vs.**<br><br>**CITIMORTGAGE, INC.**<br><br>**Defendant.** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **C.A. NO.  10-12051**<br><br>**<u>CLASS ACTION COMPLAINT</u>**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

## INTRODUCTION

1.      Davidson Calfee and Robert Gatti bring this suit on behalf of themselves and a class of similarly situated Massachusetts residents ("Plaintiffs") to challenge the failure of Defendant CitiMortgage, Inc. ("Defendant" or "Citi") to honor its agreements with borrowers to modify mortgages and prevent foreclosures under the United States Treasury's Home Affordable Modification Program ("HAMP").

2.      Plaintiffs' claims are simple – when a large financial institution promises to modify an eligible loan to prevent foreclosure, homeowners who live up to their end of the bargain expect that promise to be kept. This is especially true when the financial institution is acting under the aegis of a federal program that is specifically targeted at preventing foreclosure.

3.     As a participating servicer in HAMP, Citi has entered into a written agreement with Plaintiffs, in which it agreed to provide Plaintiffs with a permanent loan modification if Plaintiffs made required monthly trial period payments and complied with its requests for accurate documentation. Plaintiffs, for their part, have complied with this agreement by submitting the required documentation and making payments. Despite Plaintiffs' efforts, Defendant Citi has failed to meet its contractual obligation to permanently modify their loans.

4.     The same problems affect other members of the putative class. As a result, Plaintiffs and hundreds, if not thousands, of other Massachusetts homeowners are wrongfully being deprived of an opportunity to cure their delinquencies, pay their mortgage loans and save their homes. Defendant's actions thwart the purpose of HAMP and are illegal under Massachusetts law.

## JURISDICTION

5.     Plaintiffs invoke the jurisdiction of this Court pursuant to 28 U.S.C. § 1332 because the action is between parties that are citizens of different states and the amount in controversy is greater than $75,000. For diversity jurisdiction purposes, a national bank is a citizen of the state designated as its main office on its organization certificate. *Wachovia Bank, N.A. v. Schmidt*, 546 U.S. 303, 306 (2006).  Citi is, on information and belief, a New York corporation with headquarters in Missouri. Plaintiffs are citizens of Massachusetts.

6.     This court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) in that it is brought as a putative class action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and at least one member of the class of plaintiffs is a citizen of a State different from any defendant.

7.      Venue is proper in this Court pursuant to 28 U.S.C. 1391(b) inasmuch as the unlawful practices are alleged to have been committed in this District, Defendant regularly conducts business in this District, and the named Plaintiffs reside in this District.

## PARTIES

8.      Davidson Calfee resides with his girlfriend at 23 Asa Meiggs Road, Sandwich, MA 02563.

9.      Robert Gatti resides at 528 East 8th Street, Unit 1, Boston, MA 02127.

10.     Defendant CitiMortgage, Inc. is owned by Citigroup, Inc. a New York corporation. Defendant is headquartered at 1000 Technology Drive, O'Fallon, Missouri, 63368, and is the fourth largest mortgage servicer in the country.

## FACTUAL BACKGROUND

### The Foreclosure Crisis

11.     Over the last three years, the United States has been in a foreclosure crisis.  In 2009, a congressional oversight panel noted that one in eight U.S. mortgages was already in foreclosure or default, and an additional 250,000 foreclosures were beginning every month.[1]  In April 2010, the congressional oversight panel reported that foreclosures were continuing at a rapid pace.  In total, 2.8 million homeowners received a foreclosure notice in 2009.[2]

12.     The number of Massachusetts properties with foreclosure filings in 2008 was 150% higher than in 2007 and 577% higher than in 2006 – a near seven-fold increase in only two years.[3]

---

[1] *October Oversight Report: An Assessment of Foreclosure Mitigation Efforts After Six Months*, Congressional Oversight Panel at 3 (October 9, 2009), http://cop.senate.gov/documents/cop-100909-report.pdf.
[2] *April Oversight Report: Evaluating Progress on TARP Foreclosure Mitigation Programs*, Congressional Oversight Panel at 3 (April 14, 2010), http://cop.senate.gov/documents/cop-041410-report.pdf.
[3] RealtyTrac Staff, *Foreclosure Activity Increases 81 Percent in 2008*, Jan. 15, 2009, http://www.realtytrac.com/contentmanagement/pressrelease.aspx?channelid=9&accnt=0&itemid=5681 (last visited November 23, 2010).

13.     The numbers continue to rise; in September 2010, foreclosures in Massachusetts increased 26.6% compared with the same month last year.[4]  In the third quarter of 2009, foreclosures were filed on 12,667 Massachusetts properties, a 35% increase over the same period of 2008.[5] Overall in 2009, over 36,000 individual properties in Massachusetts had foreclosure filings against them which, while slightly less than 2008, still represents an increase of over 100% from 2007 levels and an increase of more than 400% over 2004.[6]

14.     Increased foreclosures have a detrimental effect not just on the borrowers who lose unique property and face homelessness, but also on the surrounding neighborhoods that suffer decreased property values and municipalities that lose tax revenue.

15.     State legislative efforts were able to temporarily slow the pace of completed foreclosures in 2009, but toward the end of the year, the number of new filings once again rose, demonstrating that foreclosures were merely delayed, not prevented.[7]

16.     The foreclosure crisis is not over. Economists predict that interest rate resets on the riskiest of lending products will not reach their zenith until sometime in 2011. *See* Eric Tymoigne, Securitization, Deregulation, Economic Stability, and Financial Crisis, Working Paper No. 573.2 at 9, Figure 30 *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1458413 (citing a Credit Suisse study showing monthly mortgage rate resets).

---

[4] Jennifer B. McKim, *Mass. Foreclosures up nearly 27%*, The Boston Globe, October 22, 2010, *available at* http://www.boston.com/business/articles/2010/10/22/mass_foreclosures_up_nearly_27_percent/.
[5] RealtyTrac Staff, *Foreclosure Activity Hits Record High in Third Quarter*, Oct. 15, 2009, http://www.realtytrac.com/foreclosure/foreclosure-rates.html (last visited November 23, 2010).
[6] Daren Blomquist, *A record 2.8 million properties receive foreclosure notices in 2009*, http://www.realtytrac.com/landing/2009-year-end-foreclosure-report.html?a=b&accnt=233496 (last visited November 23, 2010).
[7] For 2007 comparison, see Gavin, Robert, *Fewer Lose Their Homes in August*, Boston Globe, Sept. 23, 2009, *available at* http://www.boston.com/realestate/news/articles/2009/09/23/foreclosures_in_mass_drop_but_petitions_soar/ (last visited November 23, 2010).

### *Creation of the Home Affordable Modification Program*

17.      Congress passed the Emergency Economic Stabilization Act of 2008 on October 3, 2008 and amended it with the American Recovery and Reinvestment Act of 2009 on February 17, 2009 (together, the "Act"). 12 U.S.C.A. §5201 *et. seq.* (2009).

18.      The purpose of the Act is to grant the Secretary of the Treasury the authority to restore liquidity and stability to the financial system, and ensure that such authority is used in a manner that "protects home values" and "preserves homeownership."12 U.S.C.A. §5201.

19.      The Act grants the Secretary of the Treasury the authority to establish the Troubled Asset Relief Program, or TARP. 12 U.S.C. § 5211. Under TARP, the Secretary may purchase or make commitments to purchase troubled assets from financial institutions. *Id.*

20.      Congress allocated up to $700 billion to the United States Department of the Treasury for TARP. 12 U.S.C. § 5225.

21.      In exercising its authority to administer TARP, the Act mandates that the Secretary "shall" take into consideration the "need to help families keep their homes and to stabilize communities." 12 U.S.C. § 5213(3).

22.      The Act further mandates, with regard to any assets acquired by the Secretary that are backed by residential real estate, that the Secretary "shall implement a plan that seeks to maximize assistance for homeowners" and use the Secretary's authority over servicers to encourage them to take advantage of programs to "minimize foreclosures."  12 U.S.C.A. §5219.

23.      The Act grants authority to the Secretary of the Treasury to use credit enhancement and loan guarantees to "facilitate loan modifications to prevent avoidable foreclosures." *Id.*

24.      The Act imposes parallel mandates to implement plans to maximize assistance to homeowners and to minimize foreclosures. 12 U.S.C.A. §5220.

25.     On February 18, 2009, pursuant to their authority under the Act, the Treasury Secretary and the Director of the Federal Housing Finance Agency announced the Making Home Affordable program.

26.     The Making Home Affordable program consists of two subprograms. The first sub-program relates to the creation of refinancing products for individuals with minimal or negative equity in their home, and is now known as the Home Affordable Refinance Program, or HARP.

27.     The second sub-program relates to the creation and implementation of a uniform loan modification protocol, and is now know as the Home Affordable Modification Program, or HAMP. It is this subprogram that is at issue in this case.

28.     HAMP is funded by the federal government, primarily with TARP funds. The Treasury Department has allocated at least $75 billion to HAMP, of which at least $50 billion is TARP money.

29.     Under HAMP, the federal government incentivizes participating servicers to enter into agreements with struggling homeowners that will make adjustments to existing mortgage obligations in order to make the monthly payments more affordable.  Servicers receive $1000.00 for each HAMP modification.

### *Broken Promises Under HAMP*

30.     The industry entities that perform the actual interface with borrowers – including such tasks as payment processing, escrow maintenance, loss mitigation and foreclosure – are known as "servicers."  Servicers typically act as the agents of the entities that hold mortgage loans. Defendant Citi is a servicer and its actions described herein were made as agents for the entities that hold mortgage loans.

31.     Should a servicer elect to participate in HAMP,[8] they execute a Servicer Participation Agreement ("SPA") with the federal government.

32.     On April 13, 2009, Paul R. Ince, Chief Financial Officer and Senior Vice President of Citi executed an SPA, thereby making Citi a participating servicer in HAMP.  This document is attached and incorporated as Exhibit 1.

33.     The SPA executed by Mr. Ince incorporates all "guidelines," "procedures," and "supplemental documentation, instructions, bulletins, letters, directives, or other communications" issued by the Treasury, Fannie Mae or Freddie Mac in connection with the duties of Participating Servicers. These documents together are known as the "Program Documentation" (SPA at ¶ 1.A.), and are incorporated by reference herein.

34.     The SPA mandates that a Participating Servicer "shall perform" the activities described in the Program Documentation "for all mortgage loans it services."  (SPA at ¶¶ 1.A., 2.A.)[9]

35.     The Program Documentation requires Participating Servicers to evaluate *all first-lien loans* where two or more payments are delinquent for HAMP modifications. (HB 2.2. at 23.)  In addition, if a borrower contacts a Participating Servicer regarding a HAMP modification, the Participating Servicer must collect income and hardship information to determine if HAMP is appropriate for the borrower.

---

[8] Certain classes of loans, namely those held by Federal National Mortgage Association ("Fannie Mae"), Federal Home Loan Mortgage Corporation ("Freddie Mac") or companies that accepted money under the TARP program, are subject to mandatory inclusion in HAMP.  Otherwise, participation by servicers in the HAMP program is voluntary.

[9] The Program Documentation includes the Making Home Affordable Program Handbook for Servicers of Non-GSE Mortgages, Version 2,0 (September 22, 2010), https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/mhahandbook_20.pdf ("HB"), which, as of August 19, 2010, incorporates and supersedes in their entirety Supplemental Directives 09-01, 09-02, 09-03, 09-04, 09-06, 09-07, 09-08, 09-10, 10-01, 10-02, and 10-14, as well as related Frequently Asked Questions. *See* Supplemental Directive 10-09: *Making Home Affordable Program- Handbook for Servicers* (August 19, 2010), https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/sd1009.pdf.

36.     A HAMP Modification consists of two stages. First, a Participating Servicer is required to gather information and, if appropriate, offer the homeowner a Trial Period Plan ("TPP").[10]  The TPP consists of a defined period in which the homeowner makes mortgage payments based on a formula that uses the initial financial information provided.

37.     Before it offers a borrower a TPP, the servicer must determine that the loan meets certain criteria (including that the investor who owns it is participating in HAMP) and also evaluate all aspects of the homeowner's eligibility for a permanent Home Affordable Modification, subject to verification of the information used to make the evaluation.  *See* HB 5 at 33-34; HB 7 at 45; HB 1.3 at 12-13.  This includes determining what the terms of the modification will be under the HAMP "Waterfall" and checking to make sure the modification passes the "Net Present Value" test.  HB 8 at 48-49; HB 7 at 45.

38.     The TPP consists of a defined period in which the homeowner makes mortgage payments in an amount determined using the HAMP "waterfall," based on the initial financial information provided.

39.     Citi offers TPPs to eligible homeowners by way of a TPP Agreement[11], which describes the homeowner's duties and obligations under the plan and promises a permanent HAMP modification for those homeowners that execute the agreement and fulfill the documentation and payment requirements.

---

[10] The eligibility criteria for HAMP, as well as the formula used to calculate monthly mortgage payments under the modification, are explained in detail in HB, 6.3 and HB 7.  Generally speaking, the goal of a HAMP modification is for owner-occupants to receive a modification of a first-lien loan by which the monthly mortgage payment is reduced to 31% of their monthly income for the next five years.

[11] Plaintiffs refer to Supplemental Directives 09-01: *Introduction of the Home Affordable Modification Program* at 17-18 (April 6, 2009), https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/sd0901.pdf, and 09-03: *Home Affordable Modification Program- Trial Period Guidance* at 1-2 (July 6, 2009), https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/sd0903.pdf, in effect at the time Plaintiffs' TPPs were entered into, for a description of the Trial Period Plan requirements incorporated into Plaintiffs' and other class members' Agreements.

40.     If the homeowner executes the TPP Agreement, complies with all documentation requirements and makes all required TPP monthly payments, the second stage of the HAMP process is triggered, in which the homeowner is offered a permanent modification.

41.     Citi has routinely failed to live up to their end of the TPP Agreement and offer permanent modifications to homeowners. In October 2010, the U.S. Treasury reported that Citi had 116,746 HAMP-eligible loans in its portfolio.[12]  However, just 51,899 have resulted in permanent modifications even though many more homeowners had made the payments and submitted the documentation required by the TPP Agreement.  The report estimates that Citi's conversion rate of TPPs into permanent loan modifications was a mere 36% at an average trial length of 6.3 months. The report indicates that Citi is among the worst servicers in the nation in terms of the conversion rate of trial period plans into permanent modifications.

42.     By failing to live up to the TPP Agreement and convert TPPs into permanent modifications, Citi is leaving homeowners in a state of limbo and stressful anxiety, wondering if their homes can be saved.  Citi is also preventing homeowners from pursuing other avenues of resolution, including using the money they are putting toward TPP payments to fund bankruptcy plans, relocation costs, short sales or other means of curing their defaults.  Citi's conduct in promising a permanent modification following compliance with a TPP Agreement was the direct cause of Plaintiffs' inability to successfully pursue other avenues of resolving their defaults.

*Davidson Calfee*

43.     Davidson Calfee has owned his home at 23 Asa Meiggs Road in Sandwich, Massachusetts since 2007.  Davison currently works at Arthur D. Calfee Insurance Agency, Inc., owned by his father.

---

[12] Making Home Affordable Program: Servicer Performance Report Through October 2010 (November 19, 2010), http://www.financialstability.gov/docs/Oct%202010%20MHA%20Public%20Final.pdf.

44.     On February 26, 2007, Mr. Calfee took out a mortgage loan for the purchase of his home at 23 Asa Meiggs Road in Sandwich, Massachusetts in the amount of $300,000.  The transaction was divided into an "80/20" structure with two loans.  The larger loan ("Mortgage") called for monthly payments of $1,445.39.

45.     The Defendant has been the only loan servicer of the mortgage loan.

46.     Sometime after taking out the mortgage loan, Mr. Calfee began experiencing hardships which caused him to have difficulty making payments on his Mortgage, although he continued to make timely monthly payments.

47.     After receiving a solicitation, Mr. Calfee contacted Citi in June 2009 to apply for a *Making Home Affordable* loan modification.

48.     Citi told Mr. Calfee on the phone that he was "prequalified" for a modification on his Mortgage and instructed Mr. Calfee to begin making reduced monthly payments of $991.72 during the application process.

49.     By letter dated July 15, 2009, Citi offered Mr. Calfee a TPP Agreement entitled *Home Affordable Modification Trial Period Plan* ("Trial Period Plan" or "TPP").

50.     Mr. Calfee timely accepted the offer by executing the TPP Agreement on July 22, 2009, and returning it to Citi, along with the completed Hardship Affidavit, IRS Form 4506-T, and other supporting documentation.  In addition, Mr. Calfee started to make his monthly TPP payments of $991.72.  A copy of the signed TPP Agreement sent by Mr. Calfee to Citi is attached hereto as Exhibit 2.

51.     The TPP Agreement provided that the plan was effective August 1, 2009 and would run from August to October 2009.  The monthly mortgage payments were $991.72 under the TPP Agreement.

52.     The first sentence of the TPP Agreement provides: "If I am in compliance with this [TPP] and my representations in Section 1 continue to be true in all material respects, then the Lender will provide me with a Home Affordable Modification Agreement ('Modification Agreement'), as set forth in Section 3, that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage."

53.     Section 2 of the TPP Agreement provides that "TIME IS OF THE ESSENCE under this Plan" and defines the "Modification Effective Date" for the permanent HAMP modification as "the first day of the month following the month in which the last Trial Period Payment is due."

54.     Section 3 of the TPP Agreement references the means by which the principal balance and monthly payment amounts of the permanent modification will be calculated.

55.     Mr. Calfee timely made each of the payments contemplated in the TPP Agreement due in August, September, and October 2009.   He continued to make payments consistent with the TPP amount through August 2010.

56.     After entering into the TPP Agreement, Mr. Calfee followed up with Citi on multiple occasions and confirmed that his modification was still being processed.

57.     Despite Citi's reassurance that Mr. Calfee was in the TPP, Mr. Calfee continued to receive account statements indicating that payment was due on the entire amount of his loan balance. Mr. Calfee continues to receive other contacts from the Citi collections department.

58.     Even though Mr. Calfee was current on his mortgage payments when he accepted the TPP Agreement in July 2009 and despite having made all payments under the agreement, Citi began making negative credit bureau reports concerning Mr. Calfee beginning at the start of his trial period in July 2009.

59.     By letter dated September 1, 2009, in the midst of his trial period, Mr. Calfee received a delinquency notice from Citi, demanding $2,894.62, including $34.42 in late charges.  Mr. Calfee had been current on his mortgage when he accepted the TPP offer and timely made all payments under the agreement.

60.     Citi also inflicted on Mr. Calfee redundant and ambiguous and threatening demands for documents while all along continuing to accept his payments both during and after the TPP period.

61.     By letter dated February 2, 2010, Citi sent Mr. Calfee an "Urgent Notice" informing him that he needed to provide Citi with a copy of his IRS Form 4506-T to avoid risking "being dropped from the program."  Despite already providing Citi with the requested documents, Mr. Calfee timely provided Citi with the documents again.

62.     Since the TPP period began, and at all times relevant hereto, Davidson Calfee has timely responded to all information and document requests made by Citi by supplying the documents and information requested.

63.     Despite his compliance in all material respects with the terms of the TPP Agreement, Citi failed to provide Mr. Calfee a permanent loan modification by the end of his Trial period.

64.     On July 13, 2010, Defendant Citi sent Mr. Calfee a denial of his request for a loan modification because he assertedly had not provided Citi with all requested documentation.

65.     This basis for denial was in violation for the TPP Agreement.  Even if Mr. Calfee had not timely provided all required and/or all documents requested by Citi, any contractual condition of documentation had been waived by Citi long before July 13, 2010 in light of its failure to take timely action required by the TPP Agreement and because it accepted payments under the original loan contracts as modified by the TPP Agreement.

66.     On July 13, 2010, Citi sent Mr. Calfee a second letter that he was delinquent in the amount of $5,871.74 and threatened acceleration of his loan on October 11, 2010 despite the fact that Mr. Calfee had never missed a single monthly payment to Citi.

67.     At or about the time of Citi's denial, Mr. Calfee had a number of conversations with Citi's Customer Service personnel concerning the notices and possible alternatives.  During one of those conversations with Citi Customer Service staff, Mr. Calfee offered to send his supposedly missing bank statements again even though he had already sent them.  Citi refused this offer.

68.     Worried about the threat of foreclosure, Mr. Calfee struggled to resume monthly payments at his pre-Trial Period levels in September 2010 and has never missed a mortgage payment.  The arrears that had accrued during the Trial Period, however, remain.

69.     As of November 2010, Citi claims Mr. Calfee is delinquent in the amount of approximately $8,000.

70.     Defendant has breached the TPP Agreement it entered into with Mr. Calfee insofar as it promised that compliance with the TPP Agreement would result in a permanent loan modification.

71.     Mr. Calfee attempted to pursue other avenues to save his home.  He applied for a non-HAMP Citi loan modification in August, 2010.  However, Citi denied him this modification because of the amount which Citi claims is delinquent on his loan.

72.     Like the other borrowers in the class, Mr. Calfee has been living in a state of limbo and stressful anxiety, without any assurances that his home will not be foreclosed, despite his compliance with the TPP Agreement.

*Robert Gatti*

73.     Robert Gatti has owned his condominium at 528 East 8th Street, Unit 1, Boston, MA 02127 for over two years.  Robert works in footwear design for Reebok.

74.     On May 1, 2007, Mr. Gatti took out a mortgage loan for the purchase of his home at 528

East 8th Street, Unit 1, Boston, Massachusetts in the amount of $319,000.

75.     The Defendant has been the only loan servicer of the mortgage loan.

76.     In or about February 2009, Mr. Gatti began experiencing various financial hardships.

This caused Mr. Gatti to have difficulty making payments on his mortgage loan, although he

continued to make timely payments.  Indeed, Mr. Gatti never missed a payment on his mortgage

prior to his application for HAMP, and has made all of his mortgage payments through and

including October 2010.

77.     In or about February 2009, Mr. Gatti contacted Citi in an effort to learn about his options

to avoid default.  A Citi representative suggested that Mr. Gatti would be eligible for a *Making

Home Affordable Modification*.

78.     Mr. Gatti provided his income and financial information to a Citi representative over the

phone.  Mr. Gatti was "preapproved," and was told to begin paying trial payments of $1,637 during

the application process.  Mr. Gatti began paying $1,637 on March 7, 2009.

79.     In July 2009, Citi informed Mr. Gatti to begin making trial payments of $1,078.02 while

the application was still pending.

80.     Despite Citi's assurance that Mr. Gatti was in a TPP, Mr. Gatti continued to receive

account statements indicating that payment was due on the entire amount.

81.     Even though Mr. Gatti was current on his mortgage payments at this time and despite

having made all payments he was told to, Citi immediately began making negative credit bureau

reports concerning Mr. Gatti.

82.     By letter dated October 8, 2009, Citi offered Mr. Gatti a TPP Agreement entitled *Home

Affordable Modification Trial Period Plan* ("Trial Period Plan" or "TPP").

83.    Mr. Gatti timely accepted the offer by executing the TPP Agreement and returning it to Citi, along with the completed Hardship Affidavit, IRS Form 4506-T, and other supporting documents.  Mr. Gatti continued to make his monthly TPP payments of $1,078.02.  A copy of the TPP Agreement is attached hereto as Exhibit 3.

84.    The TPP Agreement provided that the plan was effective November 1, 2009 and would run from November 2009 to February 2010.  The monthly mortgage payments were $1,078.02 under the TPP Agreement.

85.    The first sentence of the TPP Agreement provides: "If I am in compliance with this [TPP] and my representations in Section 1 continue to be true in all material respects, then the Lender will provide me with a Home Affordable Modification Agreement ('Modification Agreement'), as set forth in Section 3, that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage."

86.    Section 2 of the TPP Agreement provides that "TIME IS OF THE ESSENCE under this Plan" and defines the "Modification Effective Date" for the permanent HAMP modification as "the first day of the month following the month in which the last Trial Period Payment is due."

87.    Section 3 of the TPP Agreement references the means by which the principal balance and monthly payment amounts of the permanent modification will be calculated.

88.    The last paragraph of the TPP also provides that "if my final two Trial Period Payments are received by Servicer after the close of business on the 15th calendar day of the last month of the Trial Period but before the end of the Trial Period, I agree that the Trial Period shall be extended by one calendar month…"  The Additional Trial Period was not to extend more than "30 days after the last due date listed" in Section 2 of the Agreement.

89.     Mr. Gatti timely made each of the payments contemplated in the TPP Agreement due in November, December 2009, January, February 2010.  He continued to make payments consistent with the TPP amount through October 2010.

90.     After entering into the TPP Agreement, Mr. Gatti continued to receive account statements indicating that payment was due on the entire amount.  When he followed up with Citi to inquire about these statements, he was assured that his modification was still being processed.

91.     Mr. Gatti continued to receive other contacts from the Citi collections department.

92.     Citi also inflicted on Mr. Gatti redundant and ambiguous and threatening demands for documents while all along continuing to accept his payments both during and after the TPP period.

93.     Since and before the TPP period began, and at all times relevant hereto, Robert Gatti has timely responded to all information and document requests made by Citi by supplying the documents and information requested.

94.     Despite his compliance in all material respects with the terms of the TPP Agreement, Citi failed to provide Mr. Gatti a permanent loan modification by the end of his Trial Period.

95.     On May 7, 2010, Citi sent Mr. Gatti a denial of his request for a *Making Home Affordable Modification* because he had not provided Citi with all documentation requests.  Citi sent Mr. Gatti an identical denial letter again on May 13, 2010.

96.     To the best of his knowledge, Mr. Gatti timely provided Citi with all documentation it requested.

97.     On May 28, 2010 Citi sent Mr. Gatti another letter that he was delinquent in the amount of $15,609.31 and threatened acceleration of his loan on August 26, 2010.

98.     On August 27, 2010, Harmon Law Offices sent Mr. Gatti a foreclosure notice, informing him that the loan was accelerated and the entire balance of $336,985.16 was due.

99.     When Mr. Gatti called Citi to question these developments, he spoke with a Citi employee named James.  James admitted to Mr. Gatti that there was a mistake and told Mr. Gatti that he was being put back on the trial plan.  Mr. Gatti continued to make payments in the same amount as his trial payments.

100.    In September 2010, Mr. Gatti received numerous emails and text messages from Citi informing him that he was close to receiving his permanent modification.

101.    On October 14, 2010, Citi sent Mr. Gatti another denial of his request for a *Making Home Affordable Modification* based on the net present value (NPV) test.

102.    The following day, Citi sent Mr. Gatti a notice informing him that his loan was being sold to Nationstar Mortgage.

103.    By offering Mr. Gatti a TPP Agreement based on verified income, Defendant should already have determined that Mr. Gatti passed the NPV test.

104.    Mr. Gatti is in compliance with his TPP Agreement and his representations to the Defendant continue to be true in all material respects.

105.    By letter dated October 28, 2010, Citi puzzlingly offered Mr. Gatti a permanent *Home Affordable Modification Agreement.*  The modification called for a new Principal balance of $340,214.34.

106.    By offering Mr. Gatti a permanent *Home Affordable Modification*, Citi effectively admitted that its previous contradictory denial letters sent to Mr. Gatti were mistakenly issued.

107.    When Mr. Gatti called Citi to inquire about the *Home Affordable Modification Agreement,* a Citi representative told him that his loan was already with Nationstar Mortgage, and there was nothing that Citi could do about his modification.  Citi refused to accept further payments from Mr. Gatti.

108.     Had Citi not found Mr. Gatti eligible for HAMP and offered him a TPP Agreement, Mr. Gatti would have pursued other avenues of addressing his difficulty in paying his mortgage.

109.     Like the other borrowers in this matter, Mr. Gatti has been living in a state of limbo and stressful anxiety, without any assurances that his home will not be foreclosed, despite his compliance with the TPP Agreement.

### *Class Allegations*

110.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

111.     The Plaintiffs, on behalf of themselves and all Massachusetts homeowners whose loans have been serviced by Defendant and who, since April 13, 2009, have entered into a TPP Agreement with the defendant and made all payments required by Section 2 of that TPP Agreement, other than borrowers to whom Defendant timely sent either:

     a.   A Home Affordable Modification Agreement; or

     b.   A written denial of eligibility.

112.     Plaintiffs sue on their own behalf and on behalf of a class of persons under Rules 23(a) and (b) of the Federal Rules of Civil Procedure.

113.     Plaintiffs do not know the exact size or identities of the members of the proposed class, since such information is in the exclusive control of Defendant. Plaintiffs believe that the class encompasses many hundreds of individuals whose identities can be readily ascertained from Defendant's books and records. Therefore, the proposed class is so numerous that joinder of all members is impracticable.

114.     Based on the size of the modifications at issue, Plaintiffs believe the amount in controversy exceeds $5 million.

115.   All members of the class have been subject to and affected by the same conduct. The claims are based on form contracts and uniform loan modification processing requirements. There are questions of law and fact that are common to the class, and predominate over any questions affecting only individual members of the class. These questions include, but are not limited to the following:

a.   the nature, scope and operation of Defendant's obligations to homeowners under HAMP;

b.   whether Defendant's receipt of an executed TPP Agreement, along with supporting documentation and required monthly payments, creates a binding contract or otherwise legally obligates Defendant to offer class members a permanent HAMP modification;

c.   whether Defendant's failure to provide permanent HAMP modifications in these circumstances amounts to a breach of contract and/or a breach of the covenant of good faith and fair dealing; and

d.   whether the Court can order Defendant to pay damages and what the proper measure of damages is, and also whether the Court can enter injunctive relief.

116.   The claims of the individual named Plaintiffs are typical of the claims of the class and do not conflict with the interests of any other members of the class in that the Plaintiffs and the other members of the class were subject to the same conduct, signed the same agreement and were met with the same absence of a timely permanent modification.

117.   The individual named Plaintiffs will fairly and adequately represent the interests of the class. They are committed to the vigorous prosecution of the class' claims and have retained

attorneys who are qualified to pursue this litigation and have experience in class actions – in particular, consumer protection actions.

118.    This putative class action meets both the requirements of Fed. R. Civ. P. 23(b)(2) and Fed. R. Civ. P. 23(b)(3).

119.    A class action is superior to other methods for the fast and efficient adjudication of this controversy. A class action regarding the issues in this case does not create any problems of manageability.

120.    The Defendant has acted or refused to act on grounds that apply generally to the class so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

## COUNT I
### *Breach of Contract*

121.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

122.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class described above.

123.    As described above, the TPP Agreement sent by Defendant to Plaintiffs constitutes a valid offer.

124.    By executing the TPP Agreements and returning it to Defendant along with the supporting documentation, Plaintiffs accepted Defendant's offers.

125.    Alternatively, Plaintiffs' return of the TPP Agreements constituted offers. Acceptances of these offers occurred when Defendant accepted Plaintiffs' TPP payments.

126.    Plaintiffs' TPP payments to Defendant constitute consideration. By making those payments, Plaintiffs gave up the ability to pursue other means of saving their homes, and Defendant received payments it might otherwise not have received.

127.    There is additional consideration in the form of agreements to undergo financial counseling and the provision of substantial financial documentation by Plaintiffs as a condition of the contract. This allowed Defendant to evaluate its options under the security agreement including the costs and benefits of foreclosure to it.

128.    In the alternative, the TPP Agreement is a type of binding Agreement for which the law does not require consideration.

129.    Plaintiffs and Defendant formed valid contracts.

130.    To the extent that the contracts were subject to a condition subsequent providing Citi an opportunity to review the documentation submitted by Plaintiffs during the Trial period, this condition was waived by Citi and/or it is estopped to assert it as a defense to Plaintiffs' claims.

131.    By failing to offer Plaintiffs permanent HAMP modifications, Defendant breached those contracts.

132.    Plaintiffs remain ready, willing and able to perform under the contracts by continuing to make TPP payments and provide documentation.

133.    Plaintiffs have suffered harm and are threatened with additional harms from Defendant's breach. By making payments both during and after the TPP, Plaintiffs forewent other remedies that might be pursued to save their homes, such as restructuring their debts under the bankruptcy code, or pursuing other strategies to deal with their defaults, such as selling their homes.  In addition, Plaintiffs built up substantial and unmanageable delinquency in an amount exceeding that which otherwise would have accrued.

134.    In addition to the lost opportunity cost of pursuing other means of dealing with their defaults, when a permanent modification is not offered at the close of the TPP, the borrower's permanent modification terms and other options may be adversely affected and additional fees and

charges may be applied.  On information and belief, Defendant has imposed improper fees and costs on borrowers during and after their TPP.

135.    Plaintiffs also suffered additional harm in the form of foreclosure and collection activity against their homes.

136.    Plaintiffs have suffered the additional harm of adverse credit reporting, thus undermining their credit standing for lower cost refinancing and other necessary credit transactions.

137.    Plaintiffs have lived in a state of stressful anxiety because of the limbo in which the Defendant has placed them.

138.    Members of the putative class have experienced damages in forms similar or identical to the Plaintiffs. Some members of the putative class also suffered additional harm in the form of foreclosure/ collection activity against their homes.

COUNT II
*Breach of the Implied Covenant of Good Faith and Fair Dealing*

139.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

140.    Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class described above.

141.    Defendant is obligated by contract and common law to act in good faith and to deal fairly with each borrower.

142.    "[T]he purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance." *Uno Restaurants, Inc. v. Boston Kenmore Realty Corp.*, 441 Mass. 376, 385 (2004).

143.    Defendant routinely and regularly breaches this duty by:

a.    failing to perform loan servicing functions consistent with its responsibilities to Plaintiffs;

b.   failing to supervise its agents and employees properly including, without

limitation, its loss mitigation and collection personnel and its foreclosure attorneys;

c.   routinely demanding information it has already received;

d.   making inaccurate calculations and determinations of Plaintiffs' eligibility for

HAMP;

e.   failing to follow through on written and implied promises;

f.   failing to follow through on contractual obligations; and

g.   failing to give permanent HAMP modifications and other foreclosure alternatives

to qualified borrowers.

144.   These actions constitute bad faith by the Defendant.

145.   On information and belief, the Defendant financially benefits from its breaches in a

variety of ways, including but not limited to by not hiring sufficient staff to meet its obligations

under HAMP, the imposition of fees and charges on borrowers' accounts during and after their TPP,

and obtaining greater fees from foreclosing than from modifying loans it services.

146.   As a result of these failures to act in good faith and the absence of fair dealing, Defendant

caused Plaintiffs harm.  By making TPP payments both during and after the TPP, Plaintiffs forewent

other remedies that might be pursued to save their homes, such as restructuring their debts under the

bankruptcy code, or pursuing other strategies to deal with their defaults, such as selling their homes.

In addition to the lost opportunity cost of pursuing other means of dealing with their defaults, when a

permanent modification is not offered at the close of the TPP, the borrower's permanent

modification terms may be adversely affected and additional fees and charges may be applied.

Plaintiffs have suffered the additional harm of having adverse reporting against their credit profiles.

Plaintiffs have also incurred damages because the Defendant's breach, i.e., Citi's failure to provide

permanent HAMP modifications, means that Plaintiffs are further in arrears than they would have been otherwise.  These damages are especially acute for Plaintiffs, who were not even in default at the time they entered their TPP Agreements.  Last, plaintiffs have been living in a state of stressful anxiety because of the limbo in which the Defendant has placed them.

147.   Members of the putative class have experienced damages in forms similar or identical to the Plaintiffs. Some members of the putative class also suffered additional harm in the form of foreclosure/ collection activity against their homes.

COUNT III
***Promissory Estoppel, in the alternative***

148.   Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

149.   Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class described above.

150.   Defendant, by way of its TPP Agreements, made a representation to Plaintiffs that if they returned the TPP Agreements executed and with supporting documentation, and made their TPP payments, they would receive permanent HAMP modifications.

151.   Defendant's TPP Agreements were intended to induce Plaintiffs to rely on them and make monthly TPP payments.

152.   Plaintiffs did indeed rely on Defendant's representation, by submitting TPP payments.

153.   Given the language in the TPP Agreements, Plaintiffs' reliance was reasonable.

154.   Plaintiffs' reliance was to their detriment. Plaintiffs have yet to receive a permanent HAMP modification.  By making TPP payments both during and after the TPP, Plaintiffs forewent other remedies that might be pursued to save their homes, such as restructuring their debts under the bankruptcy code, or pursuing other strategies to deal with their defaults, such as selling their homes.

In light of the declining real estate market in Massachusetts since July 2009, failure to market and sell the property at that time has reduced the amount that Plaintiffs can recover from such sale.

155.    In addition to the lost opportunity cost of pursuing other means of dealing with their defaults, when a permanent modification is not offered at the close of the TPP, the borrower's permanent modification terms are adversely affected and additional fees and charges are applied. On information and belief, Defendant has imposed improper fees and costs on Plaintiffs during and after the Trial Period.

156.    Plaintiffs have also suffered detriment in the form of foreclosure and collection activity against their homes.

157.    Plaintiffs have also incurred damages in reliance on the TPP Agreement, i.e., Citi's failure to provide permanent HAMP modifications, means that Plaintiffs are now further in arrears than they would have otherwise been.  These damages are especially acute for Plaintiffs, who were not even in default at the time they entered their TPP Agreements.

158.    Plaintiffs have been living in a state of stressful anxiety because of Defendant's conduct and in light of the ongoing risk of foreclosure.

159.    Members of the putative class have experienced harm in forms similar or identical to the Plaintiffs. Some members of the putative class also suffered additional harm in the form of foreclosure/ collection activity against their homes.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request the following relief:

a.    Certify this case as a class action and appoint the named Plaintiffs to be class representatives and their counsel to be class counsel;

b.      Enter a judgment declaring the acts and practices of Defendant complained of herein to constitute a breach of contract and a breach of the covenant of good faith and fair dealing, as well as a declaration that they are required by the doctrine of promissory estoppel to offer permanent modifications to class members;

c.      Grant a permanent or final injunction enjoining Defendant's agents and employees, affiliates and subsidiaries, from continuing the practices that are the subject of this action;

d.      Order Defendant to adopt and enforce a policy that requires appropriate training of their employees and agents regarding their duties under HAMP;

e.      Order specific performance of Defendant's contractual obligations together with other relief required by contract and law;

f.      Award actual and punitive damages to the Plaintiffs and the class;

g.      Award Plaintiffs the costs of this action, including the fees and costs of experts, together with reasonable attorneys' fees; and

h.      Grant Plaintiffs and the Class such other and further relief as this Court finds necessary and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all issues so triable.

Respectfully Submitted,
On behalf of the Plaintiffs,

*/s/ Gary Klein*
Gary Klein (BBO 560769)
Shennan Kavanagh (BBO 655174)
Kevin Costello (BBO 669100)
RODDY KLEIN & RYAN
727 Atlantic Avenue

Boston, MA  02111-2810
Tel:  (617) 357-5500
Fax:  (617) 357-5030

Stuart Rossman (BBO 430640)
Charles Delbaum (BBO 543225)
NATIONAL CONSUMER LAW CENTER
7 Winthrop Square, 4th floor
Boston, MA 02110
Tel:  (617) 542-8010
Fax:  (617) 542-8028

Michael Raabe (BBO 546107)
NEIGHBORHOOD LEGAL SERVICES
170 Common Street, Suite 300
Lawrence, MA 01840
Tel:  (978) 686-6900
Fax:  (978) 685-2933

DATE: November 29, 2010

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic File (NEF) and paper copies will be sent to those indicated as non-registered participants on November 29, 2010.

*/s/ Gary Klein*

Gary Klein